IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LEARONARDO TRUSS, #220768, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-360-MHT |
| | ) | [WO] |
| | ) | |
| LEEPOSEY DANIELS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Learonardo Truss ("Truss"), an indigent state inmate, alleging that the defendants were negligent and acted with deliberate indifference to his health and safety.  Specifically, Truss asserts that he contracted tuberculosis from a fellow inmate in November of 2011 during his incarceration at the Elmore Correctional Facility ("Elmore") because the screening and control procedures utilized for protection against infectious diseases were constitutionally inadequate.  *Complaint - Doc. No. 1* at 2-12.  Truss also alleges that hair clippers are not properly sanitized and could potentially cause the transmission of infectious diseases.  *Id.* at 9-10.  Finally, Truss challenges the manner in which he received his tuberculosis medication and the lack of an on-site health care unit at Elmore.  *Id.* at 10.  In an amendment to the complaint, Truss complains that in July of 2012 another inmate tested

positive for active tuberculosis even after inmates began the treatment regimen upon the initial outbreak. *Amendment to the Complaint - Doc. No. 13-1* at 2. Truss names Leeposey Daniels, Leon Bolding and Capt. Charles McKee, all correctional officials assigned to Elmore at the time relevant to the claims presented in this action, as defendants. Truss seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights.

The defendants filed an answer, special reports and supporting evidentiary materials, including affidavits, certified medical records, and policies/procedures, addressing Truss's claims for relief. The court thereafter informed Truss that the defendants' special reports may, at a future time, be treated as a motion for summary judgment and explained to Truss the proper manner in which to respond to a motion for summary judgment. *Order of November 26, 2012 - Doc. No. 17*; *Order of June 8, 2012 - Doc. No. 11*. Truss filed responses to the defendants' reports on June 26, 2012 (Doc. No. 12) and December 12, 2012 (Doc. No. 18).

Pursuant to the aforementioned orders, the court deems it appropriate to treat the defendants' reports as a motion for summary judgment. Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof, the sworn complaint, the plaintiff's sworn responses to the reports and relevant affidavits, the court concludes that the defendants'

motion for summary judgment is due to be granted.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence

---

[1]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*.  Despite these stylistic changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine

dispute of material fact exists when the nonmoving party produces evidence that would

allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263;

*Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal

citation omitted).  Consequently, to survive the defendants' properly supported motion for

summary judgment, Truss is required to produce "sufficient [favorable] evidence" which

would be admissible at trial supporting his claims of constitutional violations.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil*

*Procedure*.  "If the evidence [on which the nonmoving party relies] is merely colorable ...

or is not significantly probative ... summary judgment may be granted."  *Anderson*, 477

U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position

will not suffice; there must be enough of a showing that the [trier of fact] could reasonably

find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91

L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).

Conclusory allegations based on subjective beliefs are likewise insufficient to create a

genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine

dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record .... [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists." *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Truss has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment. *Matsushita*, *supra*.

# III.  DISCUSSION[2]

In November of 2011, Truss was confined at the Elmore Correctional Facility.  At this time, another inmate confined in the same dorm as Truss, an inmate identified as "Inmate X" in the evidentiary materials, exhibited symptoms of active tuberculosis.  When this inmate first reported to sick call exhibiting these symptoms, medical personnel conducted all necessary tests and performed chest x-rays.  Because active tuberculosis remained a possible diagnosis after these tests, medical personnel placed the inmate in isolation and ordered his immediate transfer to Kilby Correctional Facility for confinement in a negative pressure airflow room.

Truss alleges the defendants acted with deliberate indifference with respect to the screening process undertaken for infectious diseases, including tuberculosis, and the housing accommodations at Elmore.  Truss further complains that the defendants acted with deliberate indifference to his medical needs after his contraction of tuberculosis.  Finally, Truss alleges that the hair clippers used by inmate barbers are not properly sanitized and, therefore, use of these clippers to provide him a haircut is violative of the

---

[2]Although Truss presents additional challenges to the constitutionality of the grooming policy in his initial response to the defendants' special report, the court limits its review to the allegations set forth in the complaint and amendment thereto filed by Truss.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (district court correctly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 Fed. App'x 905, 909-910 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim).

Eighth Amendment.   The defendants adamantly deny they acted with deliberate indifference to Truss's health or safety.

## A.  Absolute Immunity

To the extent Truss sues the defendants in their official capacities, they are immune from monetary damages.  Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471

(11th Cir. 1989).

## B.  Lack of Standing - Claims Alleged on Behalf of Other Inmates

Standing is a cornerstone of American jurisprudence on which jurisdiction lies. "[A] litigant may only assert his own constitutional rights or immunities." *McGowan v. Maryland*, 366 U.S. 420, 429 (1961), citing *United States v. Raines*, 362 U.S. 17, 22 (1960); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 218-219 (1974) (plaintiff must assert a legally cognizable injury in fact before federal courts have jurisdiction). "The essence of a standing question is whether the plaintiff has alleged 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions[.]' *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703 7 L.Ed.2d 663 (1962)." *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987); *Harris v. McRae*, 448 U.S. 297, 320 (1981) (same).

Standing involves two aspects.  The first is the minimum "case or controversy" constitutional requirement of Article III.  *Saladin*, 812 F.2d at 690.  "To satisfy this 'irreducible' constitutional minimum required for standing, a litigant must show 1) that he personally has suffered an actual or prospective injury as a result of the putatively illegal conduct; 2) that the injury can be fairly traced to the challenged conduct; and 3) that the injury is likely to be redressed through court action." *Saladin*, 812 F.2d at 690, citing

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982); *Warth v. Seldin*, 422 U.S. 490, 499 (1975). If any element is lacking, a plaintiff's claim is not viable. In addition, the Supreme Court has established several requirements based on prudential considerations. *Saladin*, 812 F.2d at 690 (internal citations omitted) ("The Supreme Court has also stated that, in addition to these essential constitutional requirements, a court should consider the case in light of three principles which might counsel judicial constraint, referred to as 'prudential' considerations.... Those considerations are 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties").

In the instant cause of action, Truss references claims relative to the violation of other inmates' rights. In accordance with applicable federal law as set forth herein, Truss lacks standing to assert the constitutional rights of other persons. *Saladin*, *supra.*; *Allen v. Wright*, 468 U.S. 737, 751 (1984). The prudential limitation applicable in this case is that a litigant may not assert the legal rights or interests of another person. With respect to the claims arising from alleged violations of other inmates' constitutional rights, Truss is not "asserting [his] ... own legal rights and interests [but] rather ... the legal rights and

interests of third parties." *Saladin*, 812 F.2d at 690.  These claims therefore entitle Truss to no relief.

## C.  Negligence

Truss asserts that the actions of the defendants constituted negligence.  The law is well settled that the Constitution is not implicated by negligent acts of prison officials. *Daniels v. Williams*, 474 U.S. 327 (1986); *Mandel v. Doe*, 888 F.2d 783,787-788 (11th Cir. 1989) (mere negligence insufficient to establish constitutional violation); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) (protections of the Constitution "are just not triggered by lack of due care by prison officials."); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir.1994) (acknowledging that Supreme Court has required more than mere negligence to obtain relief under § 1983).  Consequently, the alleged negligent acts about which Truss complains do not rise to the level of a constitutional violation and provide no basis for relief in this 42 U.S.C. § 1983 action.

## D.  Deliberate Indifference Claims

Officials responsible for prison inmates may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such

knowledge disregards the risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk.' *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1982-83, 128 L.Ed.2d 811 (1994).

The law is well settled that both objective and subjective elements are necessary to establish an Eighth Amendment violation.  With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm ... exist[ed].  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028-1029.  As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference....  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  ... *[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment*." *Farmer*, 511 U.S. at 837-838 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v.*

14

*Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety....  It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'"  *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991)....  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference."  *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  "The known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference."  *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted).  Thus, "[m]erely negligent failure to protect an inmate ... does not justify liability under section 1983...."  *Id*.

> In articulating the scope of inmates' right to be free from deliberate indifference, ... the Supreme Court has ... emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'  *Estelle,* 429 U.S. at 105, 97 S.Ct. at

291; *Mandel,* 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.  *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel,* 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment.  *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that the defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law.").  Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques ... 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."  *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of diagnosis does not amount to deliberate indifference violative of the Constitution);

*Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

Pursuant to the aforementioned criteria, Truss is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation[]" in order to survive summary judgment on his deliberate indifference claim against the defendants. *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995); *Farmer*, 511 U.S. at 837-838 (To circumvent entry of summary judgment on a properly supported motion, plaintiff must produce sufficient evidence which demonstrates (1) an objectively substantial risk of serious harm; (2) a subjective awareness of this risk on the part of the defendants; (3) the defendants responded to such risk in an objectively unreasonable manner; and (4) the actions/omissions of the defendants caused his injuries); *Marsh*, 268 F.3d at 1028-1029 (same); *Hill*, 40 F.3d at 1191 n. 28 (recognizing that the Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999) (holding that for liability to attach, defendant must know of and then

disregard an excessive risk to prisoner's health or safety); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir.1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).   Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837.   Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

   1.   Contraction and Treatment of Latent Tuberculosis.   The defendants deny that they acted in violation of the plaintiff's constitutional rights with respect to his contracting tuberculosis.   Although the defendants acknowledge that Elmore was beyond its designed capacity in November of 2011, they deny acting with deliberate indifference to the health or welfare of Truss.   Warden Daniels avers that:

> On November 10, 2011 an inmate that was housed at Elmore Correctional Facility tested positive for tuberculosis (TB).   The inmate was transferred to Kilby Correctional Facility and placed in a negative air flow room which houses inmates that test positive for TB.   Elmore Correctional Facility was immediately placed under quarantine by the Alabama Department of Public Health and the independent contract medical provider for the Alabama Department of Corrections, Corizon Health Services.   Every inmate at Elmore Correctional Facility was tested for TB.   Inmate Leonardo

> Truss ... had a positive skin test [for TB] on November 18, 2011, and he
> started his TB medication on December 2, 2011.  Inmate Truss also had a
> chest x-ray on November 18, 2011.  His chest x-ray was normal.
> * * *
> ... Elmore Correctional Facility's barber shop has the following items
> in it to prevent spreading diseases:  clippercide[] spray, Tac Power, clipper
> oil and barbercide.

*Defendants' Exhibit A (Affidavit of Leeposey Daniels) - Doc. No. 10-1* at 1-2; *Defendants'*

*Exhibit B (Affidavit of Leon Bolling) - Doc. No. 10-2* at 1-2 (same).  Defendant Mckee

asserts that upon correctional officials receiving notice that Inmate X had exhibited

symptoms of active tuberculosis Elmore "was on control movement for testing of all

Inmates and Staff.  The control movement [lasted] for approximately 90 days and all

Inmates and staff were re-tested.  Inmates who tested positive [for tuberculosis] were

placed on INH per Medical.  Inmate Truss and other Inmates that tested positive were

given chest x-rays and all precautions were [taken] to ensure the exposure was controlled."

*Defendants' Exhibit C (Affidavit of Charles McKee) - Doc. No. 10-3* at 1-2.  McKee

further advises that inmates confined at Elmore have access to the health care unit at Staton

which is only a short distance from Elmore and maintains that "[i]nmate barbers are issued

necessary sanitary equipment to prevent infections or diseases."  *Id*.

The defendants provided affidavits from Linda Brown, a Registered Nurse who

serves as Regional Clinical Nurse Manager of the Office of Health Services for the

Alabama Department of Corrections, addressing the screening, containment and

preventative measures undertaken in the prison system with respect to the control of

infectious diseases, including tuberculosis.  Ms. Brown addressed the claims presented by

Truss, in relevant part, as follows:

> The Alabama Department of Corrections through its contracted medical vendor, Corizon Health Care, provides health services to inmates sentenced to the Alabama Department of Corrections.  Provisions of services must comply with the standards of the American Correctional Association, the National Commission on Correctional Health Care, as well as recommendations of the Center for Disease Control and other standards as may be defined in the Administrative Regulations, Directives, and/or Policies and Procedures of the Alabama Department of Corrections.

> In addition, within the provisions of health care, one of the program support services is the Infection Control and Immunization Program.  This program requires that the medical vendor provide[] a comprehensive Infection Control Program.  The program includes but is not limited to, ectoparasite control, inmate and employee immunization during influenza season, Methicillin-Resistant Staphylococcus Aureus (MRSA) prevention and control, Hepatitis C vaccination program, annual TB testing on all inmates, wellness and preventative health programs, and coordination with the ADOC Office of Health Services and the Alabama Department of Public Health management in times of infectious and communicable disease outbreaks that occur within a facility.

> Upon arrival to a reception Center, Kilby Corrections for males or Tutwiler Prison for Women, each inmate receives an initial intake health assessment preformed by qualified health care personnel within (12) hours after arrival.   On a rare occasion, initial intake may occur at [other correctional facilities] based on special needs.  A component of the initial health exam is the assessment for emergency medical and mental health needs, chronic diseases, and communicable diseases.

> In regards to communicable diseases, at initial intake the inmate will have a screening for any transmittable disease.  An initial TST (or other acceptable screening for tuberculosis if TST is contraindicated), Syphilis serology, HIV/AIDS, Hepatitis C screening, screens for lice are required for each inmate.  Once the inmate is transferred from the intake facility to another institution, the receiving institution conducts a transfer receiving

screening for continuity of care. The result of the last TB test is an aspect of this health review. Thereafter, annually each inmate will receive a period health assessment (physical examination). The inmate will have the option to accept or refuse the annual examination but does not have an option to refuse the component of the examination that relates to communicable diseases such as tuberculosis. Should any medical needs arise or any symptoms of TB/any communicable disease occur, the inmate has 24/7 access to health care services by means of submitting a health service request slip or by emergency walk-in at the healthcare unit.

Each institution has a formal infection control program. There is a designated infection control nurse. Monthly each institution conducts environmental inspections and reports ... the finding[s] in the monthly multidisciplinary medical committee meetings. There are monthly statistics captured regarding reportable diseases to the health department. Daily and ongoing there are logs maintained within [the] health care unit of the institutions regarding infectious diseases and trending infections for the purpose of investigations of contacts and living quarters.

At the initial intake screening, if there is not documentation of past positive skin test (TST), the inmate must participate in TB skin testing. The TB results are read within 48-72 hours after being implanted into the skin intradermally. In a case where the inmate's skin test result is 10mm or greater (greater than 5mm on inmates immunosuppressed by chronic disease or medical treatment) and the inmate has never taken TB medication in the past, the inmate is informed and educated on signs, symptoms, and treatment of TB. A symptoms questionnaire is completed. A chest x-ray is ordered, laboratory studies are ordered (Chem. 12). Three sputum [samples] are collected. A chronic disease clinic referral form[] and care plan is completed. The initial prophylaxis medication treatment [is] initiated. Monthly chronic clinic visits are scheduled for evaluation of symptoms, medication compliance, treatment, [and] adverse reactions. There is documentation on the appropriate forms...; forms [are] maintained within the inmate's medical file. If the inmate's skin test result is 10mm or greater (or >5 if immunosuppressed) and there is history of a past positive TB result, the results must be confirmed by the Department of Public Health. The symptom questionnaire is completed. A chest x-ray is ordered if indicated. [Health care personnel] [c]onfirm the completion of previous prophylaxis medication and treatment by contacting Public Health. In cases where the inmate arrives from the jail on medication, the jail is contacted and asked to send the

inmate's medication record to the intake prison.  If medication is restarted, the inmate is referred to monthly chronic disease clinic for symptoms [evaluation] and medication compliances.  The appropriate laboratory studies are ordered (Chem 12).  This entire process is not limited to intake, but at any point where symptoms of TB are exhibited regardless of assigned prison or work site.

Any suspiciously abnormal chest x-ray or, a chest x-ray that is positive for active TB disease, or positive smears: the inmate is isolated into a negative pressure room until [his] chest x-ray is improved and three smears are negative, collect sputum, appropriate laboratory studies are ordered (chem. 12), medications are started, [and] chronic monthly clinic visits are initiated[.]  The Alabama OHS [Office of Health Services] and The Alabama Department of Public Health are notified, A contact investigation is conducted, Recommendations from Public Health are followed, TST skin test[s] are repeated within 10 weeks after first implant when indicated... This process is not limited to intake, but at any point where symptoms of TB are exhibited.

November 2011, Elmore Correctional Facility had an inmate to be diagnosed with Active TB Disease.  The inmate presented to sick call with tuberculosis symptoms and was immediately isolated, sputum collected, [and] given a chest x-ray that could not rule out tuberculosis.  He was immediately transferred to Kilby Correctional Facility and placed in a negative pressure airflow room.  The Alabama Department of Corrections (ADOC) and The Alabama Department of Public Health (ADPH) [were] immediately notified.  ADPH, ADOC, and Corizon Health Services worked closely together to investigate the case to ensure that the referenced case diagnosis did not spread to others.  Information was posted and given to inmates and staff [advising that "[y]ou will have implanted just under the skin of your forearm a very minute amount of an agent that reacts if you have been exposed to the TB bacteria.  You will have another TB skin test in 10 weeks to make sure that you have not been exposed to the TB bacteria.  If both of these skin tests are non-reactive then you have not been exposed.  This agent cannot give you tuberculosis.... If either of your tests is reactive then you have been exposed but it does not mean you have active tuberculosis disease.  You are not contagious to anyone.  You will be asked to have a chest x-ray and a blood sample will be drawn.  You will be prescribed preventive medication to prevent your exposure from becoming active tuberculosis. *Attached Exhibit D-5*].

As recommended by the ADPH, the entire Elmore Correctional [F]acility was tested on site as a precautionary measure. Employees were advised to report to the Alabama Department of Public Health for testing but were not refused testing by the site medical staff if opted. The inmates and employees were informed that TB medication would be implanted under the skin of the inner forearm, a very minute amount of an agent that reacts if there was exposure to the tuberculosis bacteria. A second skin test would be repeated within 10 weeks to ... verify whether there was exposure.

November 14, 2011 Elmore Correctional Facility was placed on restricted movement for precautionary measures until further notice. Only urgent or emergent outside medical appointments would be approved by the site and Regional Physician Administrators of Corizon Health.

Eric Morgan, B.S., M.P.H, DIPM, Statewide Minority Health Coordinator for TB from the Alabama Department of Public Health is the liaison between ADPH and the ADOC. Mr. Morgan conducted a contact investigation. Per his report, the results from the first and second TST implants [indicated that upon the initial test 109 of 1178 inmates had a positive reaction with 51 of these inmates having had a previous positive result for TB whereas the second test, conducted after the transfer/release/parole of 178 inmates, showed 117 inmates of the 1019 tested with positive reactions including 16 inmates with previous positive reactions].

Inmate Truss was housed at Elmore when the active case was there in November 2011. He was given the TB test during the investigation; his result was positive. He was not an active case. He only had [a] positive TST reading. (A positive TST result[] means that there was exposure to the TB germ but there is not any active TB infection in the body). He was enrolled in chronic care clinic. He is monitored monthly by nursing and every three months by the institution's medical provider. He receives periodic blood laboratory [tests] to check his liver function. He was placed on INH and Vitamin B6 for 9 months.

Sick call screening and follow up care is provided at Elmore by [the] nursing staff and facility medical provider. Inmates are also seen in the health care unit at Staton if warranted, which is located less than a mile away. Staton is the main health care unit, which also serves Elmore Corrections. Pill call is conducted [by nurses] at Elmore. Pill pass starts around 2:30 am due to the number of inmates on INH (TB prophylaxis medication). INH pill call is conducted on the inside of Elmore Institution.

Inmates are brought inside the building when there is rain and if the weather is cold.

The Institution Barber Shop and Beauty Salon Guidelines are written to prevent skin disease transmission by either direct contact or by [formites], such as towels, combs, clippers, and razors....  There is a training program for the inmates who are hired to work in the barber area.  There are monthly inspections.  There are not any records or reports of any links with the use of hair clippers and the out break of TB at Elmore.  There has not been a Heaptitis outbreak at Elmore.

*Defendants' Exhibit D (Affidavit of Linda S. Brown) - Doc. No. 10-4 at 1-4.*

In a supplemental affidavit submitted in response to the amendment to the complaint, Ms. Brown further avers, in pertinent part, that:

The Alabama Department of Corrections is proactive in its TB prevention and exposure program.  Tuberculosis (TB) can be contagious in the community; however, it is more prevalent in the prison environment due to the close living conditions.  Involving active TB, inmates and correctional employees (contacts) can be at risk of exposure for a period of time sufficient enough for infection to progress to disease.  For this reason, one method used in the treatment, control, prevention, and elimination of TB is a process called contact investigation.

A contact investigation focuses resources on finding and treating exposed persons who are more likely to be infected or to become ill with TB disease.  Contact investigations can identify active disease as well as those who may have been exposed to the active disease.  Those who are exposed and do not have active TB maybe identified and placed on preventative or prophylaxis treatment as indicated.

Educating inmates and correctional staff on TB symptoms, causes, treatment, exposure, and prevention has greatly assisted in the identification of active TB and TB exposure.  Although TB awareness has made great strides, there are a few contributing factors that sometime makes TB ongoing.  Below are a few of those factors.

• **The condition of one's immune system**.  A person can be exposed at the time of a contact investigation but will not have symptoms of active disease until weeks or years later.  The reason for this is that a person's immune

system is strong enough to fight against the germ.  Later, if the immune system becomes weak or immune compromised, the person may not be able to resist or fight off the TB germ any longer and therefore, active TB may result.

• **TB is an airborne illness**.  TB is transmitted by air, coughing, laughing, singing, sneezing and breathing.  Living within ... close proximity in any prison dorm can increase the risk of TB exposure.

• **TB can stay alive for a few hours, especially in small places or crowded places with limited fresh air**.  Fresh air and sunlight makes it harder for the TB germ to stay alive.

• **Contacts can be exposed to more than one case, and cases and contacts can be interrelated through multiple social connections which complicate efforts to contain [the spread of TB]**.

In July of 2012, another inmate confined at Elmore Correctional Facility was diagnosed with symptoms of active TB.  Linking the month of November 2011 to July 2012, this same inmate lived in the dorm area where the first active case of TB disease was confirmed.  Once again, The Alabama Department of Public Health collaborated with the Alabama Department of Corrections in implementing the usual protocols for contact investigation, isolation, treatment, restricted movement, and follow up retesting.  This second inmate was immediately transferred to Bibb Correctional Facility and isolated in a negative pressure air flow room.  A number of staff members and inmates were tested and retested 12 weeks later.  The institution was placed on restricted movement in order to avoid further exposure.  This also helped to maintain the named contacts within a central location for the second retesting date.  The first round of tests was done on July 23, 2012.  The read and x-rays were done on July 25, 2012.

* * *

In November of 2011, Mr. Truss was tested for TB.  December 6, 2011 he was treated with INH medication.  He completed [the INH treatment] on 8/20/12.  Inmate Truss was not tested in July [of 2012] because he was taking INH at that time.  In July [of 2012] the entire Elmore Corrections was tested either by PPD placement or chest x-ray excluding the inmates and employees that were taking INH at that time.  At the present time [- November 14, 2012], Mr. Truss has not reported any symptoms of active TB.

*Defendants' Exhibit E (Affidavit of Linda S. Brown) - Doc. No. 16-1 at 1-3.*

The evidentiary materials filed by the defendants address the allegations made by Truss regarding his positive test for TB. A thorough review of these documents demonstrates that the affidavits submitted by the defendants are corroborated by the objective records contemporaneously compiled with the screening of Truss and during the treatment provided to Truss after his initial skin test showed a positive reaction for exposure to tuberculosis.

It is undisputed that the defendants took precautionary measures in accordance with the guidelines established by the Centers for Disease Control, the Alabama Department of Public Health and the contract medical care provider in an effort to (i) identify inmates with tuberculosis upon initial intake into the prison system and at yearly intervals during their incarceration, (ii) determine whether symptomatic inmates had contracted tuberculosis, (iii) protect the inmate population from possible exposure to potential infectious diseases, including tuberculosis, and (iv) ascertain whether inmates who came into contact with active tuberculosis had been exposed to the tuberculosis bacteria. The defendants also provided all necessary and appropriate treatment to Truss upon his testing positive for exposure to tuberculosis. Based on well settled law cited herein, Truss's mere desire for different housing arrangements and other screening and testing protocols does not amount to deliberate indifference. In addition, Truss has failed to present any evidence which indicates the defendants knew that the manner in which they housed inmates,

conducted the screening procedures or provided treatment to inmates, including Truss, created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is therefore devoid of evidence, significantly probative or otherwise, showing that the defendants acted with deliberate indifference to Truss's health or safety. Consequently, summary judgment is due to be granted in favor of the defendants.  *Carter*, 352 F.3d at 1350.

2.  Haircuts by Inmate Barbers.  Truss complains that the hair clippers used by inmate barbers are unsanitary.  *Complaint - Doc. No. 1* at 9-10.  The defendants deny this allegation and maintain that inmate barbers have always been required to sanitize their barbering tools with appropriate disinfectant materials.  The defendants further assert that, to their knowledge, inmate barbers properly clean their barbering tools. In addition, the evidentiary materials demonstrate that no correlation existed between the use of barbering tools at Elmore and the spread of any infectious disease.  Moreover, since April 18, 2012, inmate barbers are required to sanitize their barbering tools in compliance with the guidelines established by the Office of Health Services which require that "barber shops ... shall keep the said shops ..., and all furniture, tools, appliances and other equipment used therein, at all times in a clean and hygienic condition.  The use of soiled, greasy or visibly unclean tools, appliances, combs, brushes, etc., or towels which have not been laundered since last used is prohibited.... Shops are subject to inspection ... by representatives of

27

ADOC at any time." *Defendants' Exhibit D-4 - Doc. No. 10-8* at 1. The guidelines further require that barbers wear clean clothing, wash or sanitize their hands before attending to each inmate, wear protective clothing, remove waste materials on a daily basis and use only properly cleaned/sanitized instruments on inmates. *Id*. at 1-2. With respect to the sanitation procedures, the guidelines require that barbers "scrupulously clean all barbering instruments immediately after use on each patron." *Id*. at 3. Barbers are required to disinfect and sanitize all multi-use barbering tools after use on an inmate in an appropriate chemical solution. *Id*. at 3-4. With respect to single use items such as disposable gloves, cotton balls, strips or swabs and items which cannot be disinfected, these items "shall be discarded after being used one time." *Id*. at 4. Finally, the guidelines require that "[a]ll tools, implements, or equipment that come in contact with blood or body fluids must be disinfected by complete immersion for a minimum of 10 minutes in an EPA registered disinfectant that is effective against HIV-1 and Human Hepatitis B Virus, or tuberculocidal that is prepared and used according to the manufacturer's directions. Autoclave is [also] an acceptable method of sterilization." *Id*.

In a prior civil rights action filed by Truss raising a similar claim with respect to haircuts he received at Elmore in September of 2009, *Truss v. Thomas, et al.*, 2:09-CV-894-MHT-CSC, 2012 WL 4478775 (M.D. Ala.), appeal dismissed as frivolous April 4, 2013, motion for reconsideration of dismissal denied June 24, 2013, this court denied Truss

relief.  The relevant portion of this opinion reads as follows:

> Truss complains that there are blood-borne diseases carried by other inmates and that compelling him to get his hair cut violates his Eighth Amendment right because hair clippers used by barbers are not properly sanitized. According to him, "The hair clipper is a dangerous instrument when they have blood or some other substance on them. That could cause death or physical injury."
>
> * * *
>
> The affidavits submitted by the defendants show that inmate barbers are provided sanitizing agents and are instructed to clean and sanitize the clippers used to cut hair after each haircut; additionally, inmates are instructed to use a sanitizing solution on their scalps before a haircut.
>
> Section 1983 provides a cause of action for anyone subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment," *id.* at 828, and thus gives rise to a § 1983 claim. And, in this particular instance, it is undeniable that the Eighth Amendment protects against future harm to inmates. *Helling v. McKinney*, 509 U.S. 25, 32 (1993).
>
> To survive summary judgment on a § 1983 claim, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). The first element is an objective standard. *Hudson v. McMillian*, 503 U.S. 1, 8-9, (1992). The second element, "deliberate indifference," is a subjective standard that has three components:  "(1) subjective knowledge of a risk [to the inmate] of serious harm;  (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). As to this element,
>
>> "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both

> be aware of facts from which the inference could be drawn that
> a substantial risk of serious harm exists, and he must also draw
> the inference."

*Farmer*, 511 U.S. at 837.

With respect to the first element (the objective standard), the court will assume without deciding that the use of barbering tools that have not been sterilized or that have been improperly sterilized creates a substantially serious risk of future harm that meets the objective standard. *See, e.g., Johnson v. Epps*, [479 Fed. Appx. 583 (5th Cir. 2012)] (allegation that prison barbers were required to use and reuse clippers and razors contaminated with blood sufficient to state a claim under the Eighth Amendment).

However, Truss's claim falters on the subjective standard because Truss has failed to present evidence sufficient to show that any of the three defendants had knowledge of a risk of serious harm and disregarded that risk. First, it is undisputed that inmate barbers are required to sterilize the instruments that they use to cut inmates' hair. There is no evidence showing that Warden Thomas had any knowledge about any problems with sterilization generally or with respect to Truss's haircut.

* * *

In summary, the court concludes that Truss has failed to make the requisite showing that the defendant correctional officers had knowledge of a risk of serious harm and disregarded that risk. Without dispute, the evidence before the court does show that the prison system requires sterilization of barbering equipment, *see Helling, supra* (existence of a policy may constitute evidence that prison officials were not deliberately indifferent to the risks posed by exposure to disease)....

*Truss v. Thomas, et al.*, 2012 WL 4478775 at 2-5.

In the instant complaint, Truss states "that unsanitary hair clippers, is a dangerous instrument, when contaminated with blood or body fluids ... on them from an individual, infected with [an infectious disease]." *Complaint - Doc. No. 1* at 9.  Truss then expounds on his assertion that clippers and razors used by inmate barbers are deadly and dangerous instruments.  *Id*. at 22-24.  These arguments, however, go to the objective element of the

Eighth Amendment claim presented by Truss.  As in the prior case filed by Truss, "the court will assume without deciding that the use of barbering tools that have not been sterilized or that have been improperly sterilized creates a substantially serious risk of future harm that meets the objective standard." *Truss v. Thomas, et al.*, 2012 WL 4478775 at 4.

Truss, in an attempt to meet his burden on the objective element of his claim, makes the conclusory allegation that "prison officials are aware that the inmates barbers does not use sanitized hair clippers to cut inmates hair here at the Elmore Correctional Facility." *Plaintiff's Response to the Defendants' Special Reports - Doc. No. 18* at 21.  Truss does not identify these "prison officials" nor the manner in which he obtained personal knowledge of their purported awareness of the use of unclean barbering tools.  The defendants, in turn, submitted affidavits denying any knowledge of inmate barbers failure to properly sterilize their barbering tools.  Truss further asserts that defendants Daniels, Bolling and McKee "are aware that some inmates are intravenous drug users, has tested positive for tuberculosis, Hepatitis and other diseases, germs, and infections.  Prison officials are aware that there are homosexual acts ... here at Elmore ... and sharing the same hair clippers [and] razor blades ... are against prison rules."  *Id*.  Awareness by the defendants that some inmates at Elmore suffer from diseases or infections does not establish their awareness of improper sanitation of barbering tools, the subjective

component relevant to the instant Eighth Amendment claim.  Truss fails to present any evidence to show that defendants Daniels, Bolling and McKee had actual knowledge that barbering tools were not properly sanitized.  Thus, Truss's claim of deliberate indifference again falters on the subjective element as the record is devoid of evidence that the defendants knew of a substantial risk of harm to Truss and disregarded that risk.  Consequently, summary judgment is due to be granted in favor of the defendants on the claims addressing the barbering procedures at Elmore.  *McElligott*, 182 F.3d at 1255; *see also Carter*, 352 F.3d at 1349-1350.

### E.  General Eighth Amendment Claims

Truss alleges that the defendants subjected him to cruel and unusual punishment because he was forced to report to pill call at Elmore during the early morning hours "every Tuesday and Friday," sometimes subjected to the cold and rain, to receive his tuberculosis medication.  *Complaint - Doc. No. 1* at 10.  He also complains that Elmore does not have an on-site health care unit.  *Id*.  These claims entitle Truss to no relief.

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain.  *Id*. at 346.  Specifically, it is concerned with "deprivations of essential food, medical care, or

32

sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Prison conditions which may be "restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345-346. "'[T]he Constitution does not mandate comfortable prisons.' *Id.* at 349, 101 S.Ct. at 2400. If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.' *Id.* at 347, 101 S.Ct. at 2399. Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.' *Id.*" *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). Although the Constitution "does not mandate comfortable prisons ... neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under which a prisoner is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the

safety of the inmates.'" *Farmer,* 511 U.S. at 832  (quoting *Hudson v. Palmer,* 468 U.S.

517, 526-527 (1984)); *Helling,* 509 U.S. at 31-32.  For liability to attach, the challenged

prison condition must be "extreme" and must pose "an unreasonable risk of serious damage

to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289-1290 (11th Cir.

2004).  As previously discussed, to demonstrate an Eighth Amendment violation regarding

conditions of confinement, a prisoner must satisfy both an objective and a subjective

inquiry.  *Farmer*, 511 U.S. at 834.  With respect to the requisite objective elements,  an

inmate must first show "an objectively substantial risk of serious harm ... exist[ed].

Second, once it is established that the official is aware of this substantial risk, the official

must react to this risk in an objectively unreasonable manner."  *Marsh*, 268 F.3d 1028-

1029.

Conditions to which inmates are exposed during their confinement will constitute

cruel and unusual punishment when the conditions involve or result in "wanton and

unnecessary infliction of pain, [or] ... [are] grossly disproportionate to the severity of the

crime warranting imprisonment." *Rhodes*, 452 U.S. at 347.  "Conditions ... alone or in

combination, may deprive inmates of the minimal civilized measure of life's necessities.

Such conditions could be cruel and unusual under the contemporary standard of decency....

But conditions that cannot be said to be cruel and unusual under contemporary standards

are not unconstitutional."  *Id*. at 347.  To determine whether conditions of confinement

constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate. *Id.* at 366. In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb County*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L. Ed. 2d 894 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need.... To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 304-305 (1991) (emphasis in original).

Ms. Brown addresses the claims regarding the time of pill call and the lack of a health care unit at Elmore as follows:

Sick call screening and follow up care is provided at Elmore by [the] nursing staff and facility medical provider. Inmates are also seen in the health care unit at Staton if

35

warranted, which is located less than a mile away.  Staton is the main health care unit, which also serves Elmore Corrections.  Pill call is conducted [by nurses] at Elmore.  Pill pass starts around 2:30 am due to the number of inmates on INH (TB prophylaxis medication).  INH pill call is conducted on the inside of Elmore Institution.  Inmates are brought inside the building when there is rain and if the weather is cold.

*Defendants' Exhibit D (Affidavit of Linda S. Brown) - Doc. No. 10-4* at 4.

Despite his contentions regarding pill call and lack of an on-site health care unit, Truss has failed to establish that these conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298-299; *Rhodes*, 452 U.S. at 347.  Furthermore, Truss has failed to demonstrate any deliberate indifference or reckless disregard by the named defendants with respect to his health or safety.  Specifically, Truss has not identified any particular incident or condition from which the defendants could infer that a substantial risk of serious harm existed to him.  Consequently, summary judgment is due to be granted in favor of the defendants on these claims.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  No costs be taxed herein.

It is further

ORDERED that on or before April 29, 2015 the parties may file objections to this Recommendation. Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 15th day of April, 2015.


        /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE